IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | |
| v. ) | No. 4:17CR00321 DPM |
| ) | |
| HERBIERTO FELIX RUIZ, et al. ) | |

**UNITED STATES' RESPONSE TO
DEFENDANT'S MOTION TO SUPPRESS EVIDENCE**

The United States of America, by and through its attorney, Cody Hiland, United States Attorney for the Eastern District of Arkansas, and Liza Jane Brown, Assistant United States Attorney, requests that the Court deny defendant's motion to suppress evidence (Doc. No. 79).

**I. Facts**

On September 28, 2017, at approximately 9:17 a.m., Arkansas State Police Trooper Christopher Goodman, while sitting stationary in I-40, observed a silver Hyundai Santa Fe drift onto and cross the centerline for several hundred feet. Trooper Goodman was accompanied by Pope County Sheriff's Deputy, Hayden Saffold. Trooper Goodman initiated a traffic stop near the 73 eastbound mile-marker on I-40 in Pope County, Arkansas. Ark. Code Ann. §§ 27-51-104 & 27-51-302. Trooper Goodman's vehicle is equipped with a camera. The camera's operation is tied to the operation of the vehicle's blue lights. The camera starts recording approximately one minute before the lights are activated.

According to the dash camera video, Trooper Goodman approached the passenger side of the vehicle and identified himself as an officer for the Arkansas State Police. (9:18:03) Trooper Goodman observed that all three individuals were extremely nervous, as they were shaking and

1

extremely fidgety.[1] Trooper Goodman asked the driver, later identified as Juan Gutierrez, "Are you getting tired?" In response, the vehicle's drive stated, "Na". Trooper Goodman stated, "You were just riding down the center line for a while just check on you to make sure you are not getting sleepy at all." The driver asked, "What"? Trooper Goodman responded, "The dotted white line." Trooper Goodman asked for the driver's license, which the driver stated was in the back. Trooper Goodman requested the paperwork for the car as well as the passenger's identifications. Gutierrez got out of the vehicle and walked to the back to obtain his identification. Goodman met Gutierrez at the rear of the vehicle and Gutierrez obtained his identification. Trooper Goodman asked Gutierrez if his driving record was ok, Gutierrez stated, "I would check, I'm not 100% sure." Trooper Goodman identified the front seat passenger and renter of the vehicle as Herbierto Felix-Ruiz and rear passenger as Mario Irasola-Cruz. Trooper Goodman asked, "Who rented the car?" Gutierrez pointed to the front passenger. Upon reviewing the rental contract for the vehicle provided by Felix-Ruiz, it showed Felix-Ruiz rented the car in Cathedral City, California, on September 27, 2017, with a return date of October 3, 2017.

Gutierrez stated that he was driving because he got a little tired and that they were going all the way up to New York to visit Felix-Ruiz's son. When asked who the rear passenger was, Gutierrez paused for a few seconds and stated, "A family member that's all, his family member", referring to Felix-Ruiz. During the conversation with Gutierrez, he could not tell Trooper Goodman what hotel he was going to stay in and he thought he was coming back Monday.

Trooper Goodman then approached the passenger, Felix-Ruiz, and asked if he spoke English, Felix-Ruiz stated, only a little. Trooper Goodman then started speaking Spanish with

---

[1] The recording of the traffic stop will be delivered to the Court and referenced as Exhibit A. A copy has previously been provided to counsel for the defendant.

Felix-Ruiz.  Trooper Goodman asked Felix-Ruiz where he was going.  Felix-Ruiz stated that he was going to New York to see his son.  Trooper Goodman and Felix-Ruiz continued their conversation in Spanish and at one point Felix-Ruiz even laughed.  Trooper Goodman then asked Felix-Ruiz why he, Felix-Ruiz, had rented a car in California, when Felix-Ruiz lived in Arizona. Felix-Ruiz responded, "Mi carro no more." Translation: my car is no more.  At 9:22:00 a.m., Trooper Goodman asked Felix-Ruiz in Spanish, "No tienes nadamala pistolas drogas?" Translation: You do not have anything illegal like drugs or guns. Felix-Ruiz responded, "No." Trooper Goodman asked, "Puedo revisar el carro?" Translation: Can I check your car?  Trooper Goodman asked, "Esta Biena?" Translation: Is it ok? Felix-Ruiz responded, "Ok".

Trooper Goodman asked the back passenger to exit the vehicle and if he had any weapons. Irasola-Cruz responded, "No."  Trooper Goodman patted him down.  Before Trooper Goodman walked over to Felix-Ruiz, who already had his hands raised to allow Trooper Goodman to pat him down for weapons.  Trooper Goodman went back to his vehicle, issued a warning to Gutierrez telling him that in the future "don't be the only guy without a license driving a car."  Trooper Goodman requested all three to wait at the front of the vehicle with Deputy Saffold.  At 9:24:04 a.m., Trooper Goodman began searching the interior of the vehicle.  At 9:27:29 a.m., Trooper Goodman looked under the car to check the spare tire and observed fingerprints on the spare tire, which also appeared flat.  Trooper Goodman then pushed on the tire and he felt hard objects inside.  Trooper Goodman cut a small hole in the tire and confirmed that packages wrapped in duct tape were inside.  Which, in his training and experience Trooper Goodman believed contained narcotics.  Trooper Goodman called for backup; however, the trooper was at the 91-mile marker, 18 miles away.

At 9:32 a.m., Trooper Goodman placed all three subjects under arrest. At 9:35:14 a.m., Trooper Goodman read Gutierrez his *Miranda* rights, which he waived. Troopers Brian Syfert and Seth Race arrived to assist Trooper Goodman. The tire was removed from the car and Trooper Syfert observed that the tire did not belong to the car, as it was a 15-inch tire, while the car required 17-inch tires. Drug Task Force (DTF) agents arrived and Agent Chad Stephenson drove the car to the DTF office. At the DTF office, Trooper Goodman took the tire to Hindsman Tire and removed one side from the rim. Trooper Goodman returned to the DTF office where Agent Chad Stephenson removed six-kilogram size bundles wrapped in duct tape from the tire. Agents attempted to field test the substance; however, it was not until Trooper Derek Nietert arrived with a laser field testing device that the substance was identified as fentanyl. Officers located approximately 15 pounds of fentanyl.

On that same day, DEA Special Agent John Hensley and two DEA Task Force Officers interviewed Gutierrez, Felix-Ruiz and Irasola-Cruz. Before the interview was conducted, DEA Task Force Officer Marco Medina, who is fluent in Spanish, advised Felix-Ruiz of his Miranda rights in Spanish. Felix-Ruiz indicated that he understood those rights and agreed to waive his rights and answer questions. The interview was audio and video recorded. Felix-Ruiz told agents, essentially, a friend of his "Plom", contacted Felix-Ruiz and asked if he could deliver fifteen pounds of fentanyl to New York State. Felix-Ruiz provided Plom's telephone number and indicated he, Felix-Ruiz, was supposed to receive $28,000 for the delivery. Felix-Ruiz further stated that he contacted a friend, "Papas Fritas", to ask him if he could put Felix-Ruiz in contact with someone who would help Felix-Ruiz drive to New York. "Papas Fritas" put him in contact with Juan Gutierrez. Felix-Ruiz indicated that Gutierrez picked up the fentanyl in Los Angeles,

4

California, on Saturday September 23, 2017. Felix-Ruiz then contacted his friend, Mario Cesar Irasola-Cruz, who lives in San Luis Rio Colorado, Sonora, Mexico to ask if Irasola-Cruz would drive with him to New York. Felix-Ruiz has known Irasola-Cruz for approximately two years.

According to Felix-Ruiz, he and his wife, met Irasola-Cruz on Tuesday, September 26, 2017, on the San Luis, Arizona, border crossing and drove him to Palm Springs, California. Felix-Ruiz stated he and Irasola-Cruz rented a vehicle from Enterprise and then met Gutierrez at a Home Depot in Palm Springs, California, where all three got into the rental vehicle and drove to Gutierrez's house. Once at the house, Felix-Ruiz, Gutierrez and Irasola-Cruz all helped load the fifteen pounds of fentanyl in the vehicle spare tire before leaving for New York.

While on the way to New York, Felix-Ruiz stated that all three shared driving duties and slept in shifts, stopping only for fuel and food. Felix-Ruiz stated he planned to pay Gutierrez and Irasola-Cruz three thousand dollars out of the twenty-eight thousand dollars he was to receive for the delivery of the fentanyl.

While in the interview, Felix-Ruiz stated he had three cell phones and the phone with the SIM card was the one he used to speak with "Plom" and "Papas Fritas". However, Felix-Ruiz indicated that, prior to the start of the interview; Felix-Ruiz had eaten the SIM card because he was frightened. Felix-Ruiz consented to the search of his cell phones by DEA form, and provided Medina with the passcode to the I-Phone.

**II. Law and Argument**

Felix-Ruiz challenges the traffic stop and seizure of his person under the Fourth Amendment, and asserts that due to the allegedly illegal stop, the fruits of the stop should be suppressed. Felix-Ruiz challenges the traffic stop in this case is his bald assertion that there was

no traffic violation, and therefore, there was no probable cause to stop the vehicle, the length of the detention, and there was no probable cause to search the vehicle.   The government disagrees.

### A. Trooper Goodman had probable cause to believe that a traffic violation had been committed, and the initial traffic stop did not violate the Fourth Amendment.

"It is well established that a traffic violation – however minor – creates probable cause to stop the driver of a vehicle."  *United States v. Lyons*, 486 F.3d 367, 371 (8th Cir. 2007) (quoting *United States v. Barahona*, 990 F.2d 412, 416 (8th Cir. 1993)); *United States v. Linkous*, 285 F.3d 716, 719 (8th Cir. 2002) (holding that a traffic violation creates probable cause to stop a vehicle even if the valid traffic stop is a pretext for other investigation).   "An officer is justified in stopping a motorist when the officer 'objectively has a reasonable basis for believing that the driver has breached a traffic law.'"  *Id*. (quoting *United States v. Mallari,* 334 F.3d 765, 766–67 (8th Cir. 2003); *United States v. Thomas,* 93 F.3d 479, 485 (8th Cir. 1996))."

Here, Trooper Goodman stopped the defendant for drifting on and across the centerline for several hundred feet.   Drifting on and across the centerline for several hundred feet constitutes a violation of Ark. Code. Ann. § 27-51-302, which provides that "[a] vehicle shall be driven as nearly as practicable entirely within a single lane . . . ." and a violation of Ark. Code Ann. § 27-51-104, which provides, in party, that it is unlawful for a person operating or driving any vehicle on a public thoroughfare or private property in the State of Arkansas to make an improper or unsafe lane change on public roadways. *See United States v. Pulliam*, 265 F.3d 736, 739 (8th Cir. 2001) (holding defendant violated Arkansas law when he drifted over the fog line twice in two miles) (citing *United States v. Barberena–Jimenez,* 1996 WL 83002, *2 (8th Cir. Feb.28, 1996) (defendant was observed crossing over the fog line several times; the Court explained: "The evidence indicates that Barberena did not maintain his automobile in a single lane of traffic. This

6

constitutes an offense in Arkansas."); *see also United States v. Ozbirn,* 189 F.3d 1194, 1198 (10th Cir.1999) (finding probable cause for a traffic stop when a vehicle drifted onto the shoulder twice in less than a quarter of a mile; the applicable Kansas statute states that "[w]henever any roadway has been divided into two (2) or more clearly marked lanes for traffic ... [a] vehicle shall be driven as nearly as practicable entirely within a single lane"); *cf. Smith v. City of Little Rock,* 305 Ark. 168, 806 S.W.2d 371, 373 (Ark.1991) (holding that weaving left of the center line was a violation of § 27–51–302)); *see also Bedsole v. State*, 104 Ark. App. 253, 254-55, 256, 290 S.W.3d 607 (2009) (where the Arkansas Court of Appeals, without citing to a particular violation of the law, noted that a "car cross[ing] the fog line onto shoulder" is a valid basis for a traffic stop).

Moreover, any experienced law enforcement officer would have a reasonable concern that a driver driving down the center of the lane for several hundred feet may be under the influence of alcohol or a controlled substance or too tired to drive. An assertion that Trooper Goodman did not observe a traffic violation is baseless. Trooper Goodman asked if the driver was getting tired and making sure that the driver was not getting sleepy. None of the occupants of the vehicle denied that this occurred.

The United States acknowledges that it has the burden of "establishing that probable cause existed." *United States v. Adler*, 590 F.3d 581, 583 (8th Cir. 2009). It is clear that Trooper Goodman would testify in accordance with his report and his recorded statements close in time to his observations. However, it is not clear what evidence, if any, Felix-Ruiz would present to rebut testimony by Trooper Goodman that a traffic violation occurred, as his motion does not set forth any evidence supporting his claim.

**B. The four minutes from the time Trooper Goodman approached the car until he received consent to search did not violate the Fourth Amendment.**

Felix-Ruiz asserts that he was unlawfully detained beyond the time reasonably needed to complete the traffic stop. He argues that after Felix-Ruiz provided Trooper Goodman with the rental contact and his driver's license, the trooper should have given him a ticket and the purpose of the stop was complete. Contrary to the defendant's argument, an unlawful seizure does not occur just because an officer approaches an individual to ask some questions or requests permission to conduct a search. This is true even if the officer has no reason to suspect the individual of unlawful activity. *United States v. Pulliam*, 265 F.3d at 740-41 (citing *United States v. White,* 81 F.3d 775, 779 (8th Cir. 1996)). A request for permission to search only gives rise to a Fourth Amendment violation when the officer implies that compliance with her request is required. *Id.* Only four minutes from the moment he first approached the vehicle, Trooper Goodman asked for and received consent to search the vehicle. During those four minutes, Trooper Goodman was engaging in permissible inquiries with the occupants of the vehicle. "[A]n officer making a traffic stop does not violate the Fourth Amendment by asking the driver his destination and purpose, checking the license and registration, or requesting the driver to step over to the patrol car." *Linkous*, 285 F. 3d at 719. The officer may also "undertake similar questioning of the vehicle's occupants to verify information provided by the driver." *Id.*  Trooper Goodman could have taken additional time to check the criminal histories of the occupants of the vehicle, but chose to ask for consent to search. *See, e.g., United States v. Murillo-Salgado*, 854 F.3d 407, 415 (8th Cir.), *cert. denied,* 138 S. Ct. 245, 199 L. Ed. 2d 157 (2017).

    **C. Felix-Ruiz voluntarily consented to the search of the vehicle and Trooper Goodman's search of the vehicle did not exceed the scope of the consent.**

Felix-Ruiz contends that Trooper Goodman summarily and vaguely asked for consent to search the vehicle and that Felix-Ruiz did not respond. Felix-Ruiz is mistaken. It is clear from the video that Trooper Goodman's questioning involved whether or not Felix-Ruiz was involved in anything illegal, such as drugs or guns. When asked if Trooper Goodman could search his vehicle, Felix-Ruiz responded, "Ok."

The Eighth Circuit has recognized many instances where defendants without the ability to speak fluent English were found to have consented to a search even with language difficulties. *See, e.g., United States v. Guerrero*, 374 F.3d 584, 595 (8th Cir. 2004); *United States v. Mendoza-Cepeda*, 250 F.3d 626, 629 (8th Cir. 2001); *United States v. Marrero*, 152 F.3d 1030, 1034 (8th Cir. 1998) (affirming denial of a motion to suppress, which asserted, in part, that the defendant did not understand English and citing, among other things, proof in the record that the defendant never asked for an interpreter and the law enforcement officers asserted that he was able to communicate in English); *United States v. Sanchez*, 156 F.3d 875, 878 (8th Cir. 1998); *United States v. Cortez*, 935 F.2d 135, 142 (8th Cir. 1991). Here, when Trooper Goodman realized Felix-Ruiz could not speak English, Trooper Goodman initated a coversation with him in Spanish. Responses to Trooper Goodman's questions indicate that Felix-Ruiz understood him. understood him.

If consent is given voluntarily and absent coercion, a consensual search does not violate the Fourth Amendment. *United States v. Cortez*, 935 F.2d 135, 142 (8th Cir. 1991) (internal citations omitted). The voluntariness of a person's consent depends on the totality of the circumstances, including factors such as the defendant's age, intelligence, and education, whether the defendant knew he did not have to consent, the length of the encounter, any police intimidation or misrepresentations, where the encounter occurred, and if the defendant objected to the search.

*United States v. Sanchez*, 156 F.2d at 878 (citing *United States v. Chaidez*, 906 F.2d 377, 381 (8th Cir. 1990)); *United States v. Cortez*, 935 F.2d at 142 (citing *United States v. Weir*, 748 F.2d 459 (8th Cir. 1984)). Furthermore, regardless of whether the defendant actually consented to the search, the Fourth Amendment merely requires that officer to reasonably believe that the search is consensual. *Sanchez*, 156 F.2d at 878 (citing *Illinois v. Rodriguez*, 497 U.S. 177, 185-86 (1990)). It is not required that a suspect be aware of his right to refuse consent to make that consent voluntary. *United States v. Chaidez*, 906 F.2d at 390. "The government must show that a reasonable person would have believed that the subject of a search gave consent that was the product of an essentially free and unconstrained choice, and the subject comprehended the choice that he or she was making." *United States v. Escobar*, 389 F.3d 781, 785 (8th Cir. 2004) (quoting *United States v. Cedano-Medina*, 366 F.3d 682, 684 (8th Cir. 2004).

Trooper Goodman had been amicable to Felix-Ruiz, Gutierrez and Irasola-Cruz during the traffic stop. He was kindly chatting with Felix-Ruiz and was in no way coercive or aggressive at the time he requested consent. Responses to Trooper Goodman's questions indicate that Felix-Ruiz understood him. Felix-Ruiz's consent was freely given without duress or coercion. Felix-Ruiz was forty-five years old at the time of the traffic stop. There had been no *Miranda* warning because Felix-Ruiz, Gutierrez and Irasola-Cruz were not yet under arrest. It is safe to say Trooper Goodman reasonably believed Felix-Ruiz's choice was free and unconstrained and Felix-Ruiz understood the choice he was making. Therefore, the consent was valid and the search did not violate the Fourth Amendment. Viewing the traffic stop video, it is apparent that Felix-Ruiz understood Trooper Goodman's questions, even if he had difficulty doing so. *United States v.*

10

*Guerrero*, 374 F.3d at 595 (voluntary consent can be shown through evidence that a suspect and officer were able to communicate, even if it was with difficulty).

Even if Felix-Ruiz's consent could be construed as involuntary, it was not unreasonable for Trooper Goodman to believe Felix-Ruiz had consented to the search. *Id.* No evidence of coercion was present. Felix-Ruiz was not intimidated by Trooper Goodman, Felix-Ruiz did not object to the search, and the search occurred in a public place. *Id.* at 596. Thus, it is clear both that Felix-Ruiz voluntarily consented to the search and that Trooper Goodman reasonably believed that he had. The search of the vehicle did not violate the Fourth Amendment.

Felix-Ruiz also contends that Trooper Goodman's search exceeded the scope of the consent. "The scope of a consensual search is measured by what the typical reasonable person would have understood by the exchange between the officer and the suspect." *United States v. Brown,* 345 F.3d 574, 580 (8th Cir. 2003) (internal quotations omitted). "The scope of a search is generally defined by its expressed object, and therefore an officer may reasonably interpret a suspect's unqualified consent to search a vehicle for drugs to include consent to, inter alia: search containers within that car which might bear drugs; probe underneath the vehicle; and open compartments that appear to be false, or puncture such compartments in a minimally intrusive manner." *United States v. Ferrer–Montoya,* 483 F.3d 565, 568 (8th Cir. 2007) (per curiam) (internal quotations and citations omitted). *See also United States v. Alcantar,* 271 F.3d 731, 738 (8th Cir. 2001).

Here, four minutes into the stop Trooper Goodman received consent to search the car, searched the car, observed a flat tire with fingerprints and detected hard objects inside the tire. Felix-Ruiz did not object. Felix-Ruiz stood by the front of the car with the other occupants and

11

the Deputy. Felix-Ruiz expressed no concern during the search. Felix-Ruiz's failure to object to the continuation of the search under these circumstances may be considered as an indication that the search was within the scope of the consent. *See United States v. Alcantar,* 271 F.3d at 738 ("[w]hen the police receive consent to search for items that can be hidden in different parts of a car, searching those areas is 'objectively reasonable.' ").

The Eighth Circuit has held that "under the Fourth Amendment, deputy's search of vehicle did not exceed scope of the consent to search for drugs given by defendant's companion after deputy asked to "look" in the vehicle, even though the search took about 30 minutes; neither defendant nor his companion attempted to retract or narrow the consent given, and duration of the search was reasonable, since drugs could have been hidden in different parts of the vehicle." *United States v. Lopez-Mendoza*, 601 F.3d 861, 868-869 (8th Cir. 2010); (quoting *United States v. Alcantar*, 271 F.3d at 738 (holding an hour of searching a car for drugs and weapons was within the scope of consent where neither defendant "object[ed] to the length of the search" at any time)).

### D. Felix-Ruiz voluntarily waived his *Miranda* rights and all of the requirements of the Fifth Amendment were satisfied.

Lastly, upon his arrest and, again, before he was interviewed by DEA, Felix-Ruiz was advised of his *Miranda* rights in Spanish. Pursuant to *Miranda v. Arizona*, 384 U.S. 436, 444 (1966), law enforcement officers must advise suspects of their rights before a custodial interrogation. In the instant case, before his interview with DEA, which is audio and video recorded, Felix-Ruiz indicated that he understood those rights, agreed to waive those rights, and made a statement. While it is true that lack of handcuffs can support a finding that a waiver was knowing and voluntary, *see United States v. Castro-Higuera*, 473 F.3d 880, 885-86 (8th Cir. 2007), there is no law to support the proposition that handcuffs prohibit a knowing and voluntary waiver.

To the contrary, handcuffs merely support the uncontested conclusion that Wade's interview was custodial, which is precisely what *Miranda* is for. "The rule the Court established in *Miranda* is clear. In order to be able to use statements obtained during **custodial** interrogation of the accused, the State must warn the accused prior to such questioning of his (rights)…." *Fare v. Michael C.*, 442 U.S. 707, 717, 99 S. Ct. 2560, 2568, 61 L. Ed. 2d 197 (1979) (emphasis added).

In addition to being advised verbally of his *Miranda* rights, Felix-Ruiz signed a waiver form acknowledging his rights and agreeing to waive them. The law does not require written warnings. "*Miranda* warnings need not be given in the exact form described in *Miranda* but simply must reasonably convey to a suspect his rights," and the Supreme Court has stated that "[w]e have never insisted that *Miranda* warnings be given in the exact form described in that decision." *Duckworth v. Eagan*, 492 U.S. 195, 195, 109 S. Ct. 2875, 2876, 106 L. Ed. 2d 166 (1989). A signed form was used in the instant case but is not a requirement, because "the officer in the field may not always have access to printed *Miranda* warnings…" *Id*. "The inquiry is simply whether the warnings reasonably 'conve[y] to [a suspect] his rights as required by *Miranda*." *Id*., citing *California v. Prysock*, 453 U.S. 355, 101 S.Ct. 2806, 69 L.Ed.2d 696 (1981).

As it is undisputed that Felix-Ruiz was advised of his *Miranda* rights both verbally and in writing, which he acknowledged he understood, all requirements of the Fifth Amendment were satisfied. The statement was lawfully obtained and should not be suppressed. It should also be noted that Felix-Ruiz does not argue his statement was involuntary obtained.

> **E. The evidence should not be excluded because exclusion would not serve the objectives of the exclusionary rule, which is to deter police misconduct.**

"[T]he Fourth Amendment contains no provision expressly precluding the use of evidence obtained in violation of its commands." *Arizona v. Evans,* 514 U.S. 1, 10, 115 S.Ct. 1185, 131 L.Ed.2d 34 (1995). Rather, exclusion of evidence is "a

13

> judicially created rule . . . 'designed to safeguard Fourth Amendment rights generally through its deterrent effect.'" *Herring,* 129 S.Ct. at 699 (quoting *United States v. Calandra,* 414 U.S. 338, 348, 94 S.Ct. 613, 38 L.Ed.2d 561 (1974)). "Indeed, exclusion has always been our last resort, not our first impulse, and [Supreme Court] precedents establish important principles that constrain application of the exclusionary rule." *Id.* at 700 (internal citations and quotation marks omitted).
>
> As a judicially-created remedy, the exclusionary rule applies only where "its remedial objectives are thought most efficaciously served." *Evans,* 514 U.S. at 11, 115 S.Ct. 1185. The exclusionary rule is not an individual right, but it "applies only where it 'results in *appreciable deterrence.*' " *Herring,* 129 S.Ct. at 700 (quoting *United States v. Leon,* 468 U.S. 897, 909, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984)) (emphasis added) (some internal marks omitted); *see also Penn. Bd. of Probation & Parole v. Scott,* 524 U.S. 357, 368, 118 S.Ct. 2014, 141 L.Ed.2d 344 (1998) ("We have never suggested that the exclusionary rule must apply in every circumstance in which it might provide marginal deterrence."). The Court also balances the benefits of deterrence against the costs of excluding the evidence, particularly the social costs of "letting guilty and possibly dangerous defendants go free— something that 'offends basic concepts of the criminal justice system.' " *Herring,* 129 S.Ct. at 701 (quoting *Leon,* 468 U.S. at 908, 104 S.Ct. 3405). Finally, the Supreme Court includes "an assessment of the flagrancy of the police misconduct" in its calculus of whether the exclusionary rule should be applied. *Id.* (internal marks omitted).

*United States v. Hamilton*, 591 F.3d 1017, 1027–28 (8th Cir. 2010).

Trooper Goodman had no reason to believe that the stop, detention, or search was in violation of the Fourth Amendment. He acted in good faith. Even if the Court finds a Fourth Amendment violation, application of the exclusionary rule would not result in appreciable deterrence. Therefore, the motion should be denied.

The Court's Pretrial Order for Criminal Cases provides that the "Court will deny an evidentiary hearing on suppression motions that are supported only by general or conclusory assertions founded on mere suspicion or conjecture." "A district court must hold an evidentiary hearing only when the moving papers are sufficiently definite, specific, and detailed to establish a contested issue of fact." *United States v. Stevenson*, 727 F.3d 826, 830 (8th Cir. 2013) (citing

14

*United States v. Mims,* 812 F.2d 1068, 1073–74 (8th Cir. 1987) ("A hearing is also unnecessary if it can be determined that suppression is improper as a matter of law."). "Where a defendant offers only conclusory allegations in support of a motion to suppress, and where those allegations are unsupported by any citation to the record, a district court does not abuse its discretion by refusing to hold an evidentiary hearing." *Id.* at 831 (citing *United States v. Allen,* 573 F.3d 42, 52 (1st Cir. 2009); *United States v. Mims,* 812 F.2d 0168, 1073–74 (8th Cir. 1987)). Not all crimes or events supporting probable cause occur on video, and the failure to capture a traffic violation on video is insufficient to support a finding that the traffic stop was illegal.

### III.   CONCLUSION

For the reasons stated herein, the defendant's motion to suppress should be denied without an evidentiary hearing.

Respectfully Submitted,

CODY HILAND
United States Attorney

By: LIZA BROWN
Assistant U.S. Attorney
Bar # 2004183
P.O. Box 1229
Little Rock, AR   72203
501-340-2600
Liza.Brown@usdoj.gov